## Case No. 2,489.

CASE v. CITIZENS' BANK OF LOUISIANA.

[2 Woods, 23; [1] 1 Thomp. Nat. Bank Cas. 276.]

Circuit Court, D. Louisiana. Nov. Term, 1873.

NATIONAL BANKS —TRANSFERS IN CONTEMPLATION . OF INSOLVENCY—DEFINITION OF "INSOLVENCY."

1. The word "insolvency," as used in the 52d section of the currency act of 1864 (13 Stat. 115; Rev. St. § 5242). is synonymous with the same word as used in the bankrupt act.

[Cited in Roberts v. Hill. 23 Fed. 311.]

2. To make transfers, assignments, deposits and payments void under said section, it is only necessary that the insolvency should be in the contemplation of the bank making the transfers, etc.. and not that it should also be known to or contemplated by the party to whom they are made.

[Cited in National Security Bank v. Price, 22 Fed. 698; Roberts v. Hill. 23 Fed. 311. Criticised in Roberts v. Hill. 24 Fed. 574, 576.]

This is a bill in equity [by Charles Case. receiver. against the Citizens' Bank of Louisiana], and was submitted for final hearing and decree upon the pleadings, evidence, and arguments of counsel.

John A. Campbell, Thomas Allen Clarke, J. D. Rouse, and F. F. Case, for complainant.

Armand Pitot and M. M. Cohen, for defendant.

WOODS, Circuit Judge. The 52d section of the "currency act" (13 Stat. 115) declares that "all transfers of the notes, bonds, bills of exchange, or other evidences of debt owing to any association, or of deposits to its credit; all assignment of mortgages. sureties on real estate, or of judgments or decrees in its favor; all deposits of money, bullion, or other valuable thing for its use or for the use of any of its shareholders or creditors, and all payments of money to either, made after the commission of an act of insolvency, or in contemplation thereof with a view to prevent the application of its assets in the manner prescribed by this act, or with a view to the preference of one creditor to another, except in payment of its circulating notes, shall be utterly null and void." Relying upon these provisions of the statute, the complainant, Charles Case, the receiver of the Crescent City National Bank, files this bill against the Citizens' Bank of Louisiana.

The bill, after averring the appointment of the complainant as receiver, alleges, in substance, that between the 1st day of December, 1872, and the 6th of February, 1873, the Crescent City Bank drew bills of exchange on F. de Lizardi & Co., of London, amounting in the aggregate to £26.501 5s. 7d.. each being payable in sixty days after sight, and sold the same to the defendant, the Citizens' Bank. That afterwards, about the 26th of February, 1873, the said Lizardi & Co. having. after the acceptance by them and before the maturity of the bills, failed, the defendant demanded from the Crescent City Bank indemnity against loss on said bills, and for the purpose of such indemnity the Crescent City Bank transferred to the defendant promissory notes, bills and evidences of debt amounting to $150,000, which were then and there the property of the Crescent City Bank. That at the time of the transfer, the Crescent City Bank had drawn and had negotiated for value bills of exchange on Lizardi & Co. to an amount largely exceeding its capital stock; that the bank had provided Lizardi & Co. with funds to meet the same at maturity; that by the failure of Lizardi & Co. the bills would be dishonored and the bank held liable therefor, and that the funds provided for the payment of said bills had been then lost to the bank by reason of the failure of Lizardi & Co., and that by reason thereof and of other losses the bank was then insolvent; that its insolvency was known to itself and the defendant; that said notes. bills, and evidences of debt were transferred to the defendant in contemplation of the insolvency of the Crescent City Bank, and with a view to give a preference to the defendant over other creditors. The bill prays that the transfer of said assets be declared void, and that defendant may be compelled to account for them to the complainant.

The answer of the defendant. the Citizens' Bank, which is given under the common seal of the corporation, denies all the material averments of the bill. except that the Crescent City Bank had provided Lizardi & Co. with funds to meet the bills drawn on them; that by the failure of Lizardi & Co., the said bills would be dishonored and the bank held liable therefor, and that the funds provided had been lost to the bank at the time of the transfer to the defendant

---

[1] [Reported by Hon. William B. Woods. Circuit Judge, and here reprinted by permission.]

of said assets. The complainant files the general replication.

In passing upon the case, it is material to consider what it is necessary for the complainant to establish in order to render void the transfer of the notes, bills, etc., to the Citizens' Bank. The transfer must have been made after the commission of an act of insolvency, or in contemplation of insolvency, and with a view to give a preference to one creditor over another, or with a view to prevent the application of the assets of the bank in the manner prescribed by the currency act. I know of no reason why a different meaning should be given to the word "insolvency" as applied to banks in the currency act, from the meaning given the same word in the bankrupt act as applied to traders.

"Insolvency, as used in the bankrupt act of 1867 [14 Stat. 534], when applied to traders, does not mean an absolute inability of the debtor to pay his debts at some future time, upon a settlement and winding up of his affairs, but a present inability to pay in the ordinary course of his business; or in other words, that a trader is insolvent when he cannot pay his debts in the ordinary course of his business, as men in trade usually do, and such must be the conclusion even though his inability be not so great as to compel him to stop business." Wager v. Hall, 16 Wall. [83 U. S.] 599. This definition of insolvency, in my judgment, is the meaning of the word in the currency act. It is only necessary that the insolvency should be in the contemplation of the bank making the transfer. The party to whom the transfer is made need not know of or contemplate the insolvency of the bank which makes the transfer. Thus it was held by Mr. Justice Story, under the bankrupt act of 1841 [5 Stat. 442], that to constitute a conveyance "in contemplation of bankruptcy," it was not necessary that the professed creditor should know of the debtor's insolvency, or should co-operate with him to obtain a priority of payment. Peckham v. Burroughs [Case No. 10,897].

The facts clearly established by the evidence, and about which there seems to be no dispute, are as follows: Between December 2, 1872, and February 6, 1873, the Crescent City Bank had drawn bills on F. de Lizardi & Co., of London, which had been sold by the bank, and which were held as follows:

By the Citizens' Bank.............. £19,400
By the Canal Bank of New Orleans..   5,500
By the State Nat. Bank of New Orleans .......................   5,000
By Eugene Kelly & Co..............  35,000
By Edward C. Palmer..............  10,000
By Mr. A. Carriere................   4,000
By Duncan, Sherman & Co..........   5,000

—And other bills held by other persons. So that at the time of the failure of the house of Lizardi & Co., there were bills outstanding drawn by the Crescent City Bank on Lizardi & Co., to the amount of £111,000. The failure of the house of Lizardi & Co., the drawees and accepters of these bills, took place on February 14, 1873, before the maturity of any of the bills, and was positively known to Summers, the president of the Crescent City Bank, on the 16th inst. By the transfer of notes, bills, and other evidences of debt, on February 26th, by the Crescent City Bank to the Citizens' Bank, the latter was fully secured, for the bills held by it, drawn on Lizardi & Co. by the Crescent City Bank, to the amount of £19,400. On March 13th, in consequence of the failure of Lizardi & Co., the circulation of the Crescent City Bank went to protest, and the bank has since been put in liquidation. The Citizens' Bank lost nothing by the failure of the Crescent City Bank, having been fully secured for the bills held by it on Lizardi. The Canal Bank, Eugene Kelly & Co., Palmer & Carriere, received no security on or payment of the bills held by them, amounting to £54,500. The capital stock of the Crescent City Bank was $500,000.

These facts show the commission of an act of insolvency by the Crescent City Bank, the insolvency of the bank, the transfer of notes, bonds, etc., and the preference of one creditor to another. These facts alone do not, however, make the transfer void. It is necessary to the complainant's case to establish two additional facts: 1. That the transfer was made in contemplation of the insolvency of the Crescent City Bank, and 2. That it was made with a view to give a preference to the Citizens' Bank over other creditors, and to prevent the application of said assets in the manner provided by the currency act. If the complainant has established these facts in addition to those already stated, he has made out the case averred in his bill.

In passing upon the first point, it is pertinent to inquire, was the Crescent City Bank really insolvent at the time of the transfer of the notes, bills, etc., to the Citizens' Bank, on the 26th of February, 1873? We have in evidence a report of the condition of the bank on the 14th of February, 1873, the very day that Lizardi & Co., of London, failed. On that day the resources are stated at $1,545,854.51, in which is included an item of $561,958.01, under the head of "Other Cash Assets." This item is shown by the testimony of John Davis, the bookkeeper of the bank, "to consist of a class of bonds, stocks, etc., which bonds amount to 90 per cent. of the capital, which is $564,000. The bonds are $500,000. So that on account of $564,000, there were $500,000 bonds." It is evident from this statement that this item of $561,958.01 consisted mainly of the bonds of the United States to secure the circulation of the bank, with the premium thereon. It was not therefore a cash item, it was not available for the payment of the liabilities of the bank. The exhibit in which this item occurs, and the same item is found in the ex-

hibits made on February 24th, February 28th and March 7th, was not a fair statement of the condition of the bank. This is made apparent by the fact that among the liabilities of the bank, the capital stock is not set down as a liability to offset the bonds deposited to secure circulation, with the premium thereon. The item, therefore, of $561,958.01, should be stricken from the statement of the resources of the bank. This leaves the resources at $983,896.50, on February 14th. On the same day, the liabilities of the bank are stated at $973,303.12, showing an excess of resources over liabilities of $10,593.38 only. But on the 14th of February, Lizardi & Co., of London, failed. On that day, as shown by the evidence of Davis, the exchange clerk of the Crescent City Bank, the amount of the bills outstanding drawn by the Crescent City Bank on Lizardi & Co., of London, was £111,000, which, reduced to dollars at the current rate of exchange at that time, would be about $604,000. The bank had sent forward about $606,000 to cover these drafts; these remittances were misappropriated by Lizardi & Co., and none of the $604,000 of exchange drawn by the Crescent City Bank on Lizardi & Co. was paid by them.

Here then is a bank which on February 14th shows resources over liabilities to the amount of only $10,593, and on that day, by the failure of Lizardi & Co., has withdrawn from its available resources, for an indefinite period, the sum of $606,000, with the prospect of losing in the end a large portion thereof. This statement makes perfectly clear the "inability" of the Crescent City Bank "to pay its debts in the ordinary course of business;" in other words, makes clear its insolvency. This loss or suspension of assets by the failure of Lizardi & Co. was greater than the available resources of the bank, added to its capital stock, by more than $95,000. Summers, the president of the Crescent City Bank, must have known of this condition of affairs before the 26th of February. In fact he must have known it; it is impossible he should not have known it as soon as he heard of the failure of Lizardi & Co. Reynes testifies that "on the 15th of February, he received a dispatch from Eugene Kelly, of New York, who held bills of the Crescent City Bank on Lizardi & Co. to the amount of £35,000, that the acceptances were due that day, and that they were unpaid, and that such dishonor was virtually the failure of the bank, and that he expected no preferred payments. Reynes showed the telegram to Summers, the president of the Crescent City Bank, and insisted on his acting according to it." Faurie, the cashier of the Crescent City Bank, testifies that the remittances sent by the bank to Lizardi & Co., of London, to pay those bills, were misappropriated and therefore the bills came back. "When we found the remittances were misappropriated, we thought it would break the bank." "Some of the directors thought that

if the remittances had been properly appropriated, they would come out all right; but if they had not been properly appropriated, they knew the bank had gone under. They said so. As soon as we were advised of the misappropriation of the remittances made by Lizardi & Co., of London, every officer of the bank knew that it was broken." Geo. Jonas, the president of the Canal Bank, testifies, that as soon as it was known that the house of Lizardi & Co., of London, had failed, the credit of the Crescent City Bank was materially impaired, its business was diminished, there was urgency and anxiety among its creditors to obtain security. As soon as it was known that Lizardi & Co. had failed, every creditor wanted security if he could get it. He (Jonas) went to see Summers, the president, several times, to get security. Summers made an appointment to meet him on February 23d, and said he would bring bills receivable of a sufficient amount to cover the bills held by the Canal Bank. He failed to keep the appointment, but sent Jonas word the next day that his board determined to make no further preferences, and declined to give any security whatever." He further testified, that upon the failure of Lizardi & Co., the stock of the Crescent City Bank ran down rapidly, and he heard of parties who were anxious to get rid of it for nothing, on account of their liability as stockholders in case of a failure. Edward C. Palmer testifies, that he was in commercial business in New Orleans, and was director in a national bank at the time of the failure of Lizardi & Co. He says that upon that event there was but one opinion expressed, that it could not do anything else but ultimately break the Crescent City Bank. This was a general opinion among financial men that he talked with. L. F. Generes, who had often been director of banks in New Orleans, testifies that immediately on the failure of Lizardi & Co., of London, there was great anxiety here about the Crescent City Bank from its relations with Lizardi & Co. It manifested itself some days after the failure was known. At first there was no anxiety, but still it grew up and became very urgent.

The result of this evidence is that upon the failure of Lizardi & Co., of London, the Crescent City Bank was insolvent. As soon as it was known that Lizardi & Co. had misappropriated the funds sent to pay the bills drawn on them by the bank, the insolvency of the bank was known to its cashier and directors, and was currently rumored and suspected by the interested public. The board of directors, as early as February 22d, had "determined to make no further preferences." Here is the official act of the board of directors, which, in effect, implies the insolvency of the bank. Is it possible that Summers, a member of and president of the board of directors, and who himself reported this action of the board to Jonas, did not know of the insolvency of the bank?

The "contemplation of insolvency" is in my judgment clearly established.

It remains to inquire whether the transfer of notes, etc., made on the 26th of February to the Citizens' Bank, in contemplation of insolvency, was made with a view to the preference of one creditor to another. The fact is beyond dispute that the Citizens' Bank was preferred, because it was paid in full, while other creditors, similarly situated, were not paid any part of their claims. Did Summers, in making the transfer of notes, etc., do it with a view to a preference? The law presumes he had in view the natural result of his acts. But defendant claims to have shown that the transfer was made to provide means to pay the bills drawn by the Crescent City Bank in London, and thus save the credit of the bank. Why then were not all the holders of the bills applied to to discount paper from the portfolio of the bank, and thus furnish the means, each to take care of his own bills. This arrangement was made with a part, but not with all. It was made with the Citizens' Bank and others. They were secured, and the bills held by them paid. The bills held by others were left unsecured, and were protested. How was the credit of the bank to be maintained by such a course? E. C. Palmer, who held £10.000 of the bills of the Crescent City Bank, drawn on Lizardi & Co., heard of the failure of the drawers on February 15th. and within two hours went around to the bank. He saw Faurie, the cashier, who told him to go in and see Summers, the president of the bank. He found him talking with three or four of the directors. No offer was made to Palmer to transfer to him assets from the portfolio of the bank, in order to secure him. Doubtless he would have been willing to take care of the £10,000 of bills of exchange which he held, drawn by the Crescent City Bank on Lizardi & Co., if he could have been made secure out of the portfolio of the bank. So would the Canal Bank, and Eugene Kelly & Co., and Carriere. But no such opportunity was afforded them. These favors were reserved by Summers for the Citizens' Bank and others.

The truth is, as is evident by the testimony, that one at least of the purposes of the transfer of assets to the Citizens' Bank by the Crescent City Bank was to secure the Citizens' Bank on the bills which it had purchased from the Crescent City Bank on Lizardi & Co. The pretense that this transfer was to sustain the credit of the Crescent City Bank is too transparent to deceive any one. I am of opinion, therefore, after a review of all the evidence in the case, that the transfer by the Crescent City Bank to the Citizens' Bank, of the notes, bills etc. mentioned in the bill of complaint, was made in contemplation of insolvency, with a view to the preference of one creditor to another, and is therefore utterly null and void. Let a decree be entered as prayed in the bill.